**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-MJ-04078-EGT

UNITED STATES OF AMERICA

v.

JOSE MIGUEL GONZALEZ VIDAL,
   a/k/a "El Chupa,"
   a/k/a "Jose Gonzalez Perez,"

   Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? _____ Yes __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
Quinshawna S. Landon
Assistant United States Attorney
Fla. Bar No. 99835
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9632
Fax: (305) 530-7976
Quinshawna.Landon@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>Jose Miguel Gonzalez Vidal,<br>a/k/a "El Chupa"<br>a/k/a "Jose Gonzalez Perez"<br><br>*Defendant(s)* | )<br>)<br>) Case No.  20-MJ-04078-EGT<br>)<br>)<br>) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  May 1, 2018 through June 30, 2018  in the county of  Miami-Dade  in the
 Southern  District of  Florida, and elsewhere , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(iv); 1324(a)(1)(B)(i); and 1324(a)(1)(A)(V)(I) | Conspiracy to encourage and induce aliens to enter the United States for financial gain and encouraging and inducing aliens to enter the United States for financial gain |
| 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii) | Conspiracy to bring an alien into the United States and bringing an alien into the United States for financial gain |
| 18 U.S.C. § 1201(a)(1) and 1201(c) | Conspiracy to commit kidnapping and kidnapping |

This criminal complaint is based on these facts:
 SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____  ID #7321
*Complainant's signature*

SA Albert M. Ordonez, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  Telephone  (specify reliable electronic means)
Date:  11/24/2020 
_____
*Judge's signature*

City and state:   Miami, Florida   Edwin G. Torres, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Albert M. Ordonez, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a special agent with the Department of Homeland Security/Homeland Security Investigations (DHS/HSI) and have been so employed since 2009. I am currently assigned to the Human Trafficking Group in the HSI Miami Office where I am responsible for conducting investigations regarding violations of federal laws, particularly those laws found in Titles 8, 18, 19 and 21 of the United States Code. My duties include investigating violent crimes involving human smuggling, kidnapping, and extortion, among other crimes. Before joining the DHS/HSI, I was a Postal Inspector with the United States Postal Inspection Service for 10 years.

2. This Affidavit is submitted for the limited purpose of establishing probable cause that Jose Miguel Gonzalez Vidal, a/k/a "Jose Gonzalez Perez," a/k/a "El Chupa" ("GONZALEZ VIDAL") did knowingly and intentionally:

    a. Conspire to encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv) and 1324(a)(1)(B)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

    b. Encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv);

    c. Conspire to bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

    d. Bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 1324(a)(2)(B)(ii);

      e. Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c); and

      f. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(a)(1).

3. The statements contained in this Affidavit are based on my personal knowledge, as well as information provided to me by other law enforcement officers, including those based in Mexico, law enforcement support personnel, and civilian witnesses. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include every fact known to me in connection with this investigation. I have only set forth the facts that I believe are necessary to establish probable cause for the offenses described in this Affidavit.

## PROBABLE CAUSE

### BACKGROUND

4. The Federal Bureau of Investigation ("FBI"), HSI, and law enforcement in the states of Yucatan and Quintana Roo, Mexico, have been investigating a Transnational Criminal Organization ("TCO") that has engaged in alien smuggling and kidnapping for more than a decade. The investigation has revealed that members of the TCO organized numerous smuggling trips per year in which they smuggled Cuban migrants from Cuba into the United States, by way of Mexico.

5. Upon smuggling the Cuban migrants out of Cuba and into Mexico, the members of the TCO demanded that the Cuban migrants pay them a fee of $10,000 in United States dollars (USD) before completing the journey into the United States. If the Cuban migrants could not pay the smuggling fee, the members of the TCO locked them in a house, threatened them, and forced them to call their families to obtain the money so that they could be released.

6. To coerce the relatives into paying the fee, the members of the TCO sent them threats, pictures, and video recordings of the Cuban migrants being shocked with a stun gun and/or beaten. The members of the TCO also threatened to kill the victims if they did not receive the $10,000 USD. If a relative was able to pay the $10,000 USD ransom, the members of the TCO would release the respective victim and send him or her by bus to the Mexican-United States border with instructions to seek asylum. For those victims whose relatives could not pay the fee, the kidnappers tortured them while they continued to attempt to collect their fee.

7. During the investigation, the FBI and HSI interviewed cooperating defendants and other co-conspirators who were members of the TCO, some of whom have pleaded guilty to human smuggling and other related charges. These individuals proffered that they and other members of the TCO used vessels and engines, which were stolen from South Florida and elsewhere in the United States, to facilitate the smuggling operation and to finance their criminal enterprise. They transported the vessels to Mexico, sometimes loaded with firearms obtained in the United States. Once the vessels arrived in Mexico, the members of the TCO re-painted and created fictitious registrations for them. The members of the TCO then either sold the vessels or used them to transport the Cuban migrants from Cuba to Mexico.

8. On or about October 1, 2020, the FBI received information that an individual using the alias "El Chupa," later identified as GONZALEZ VIDAL, participated in the alien

smuggling/kidnapping operation. Specifically, the FBI learned that GONZALEZ VIDAL kidnapped and tortured Cuban migrants and extorted their families for ransom. After conducting several interviews, including an interview of VICTIM 1 and one of his relatives, the FBI determined the following:

## VICTIM 1

9. In or around May of 2018, VICTIM 1, along with approximately fourteen (14) other Cuban males and two (2) Cuban females, boarded a go-fast style vessel in Cuba believing they were going to be smuggled into the United Sates. VICTIM 1, along with the other migrants were instructed to stay seated on the deck in the front end of the vessel while they were underway at sea. VICTIM 1 observed one captain, one crew member, and extra fuel tanks onboard.

10. The next day, just a few hours prior to the migrants arriving by boat in Mexico, a second vessel approached the boat that was transporting VICTIM 1 and the other migrants. The crew members from the second vessel took the migrants' identification documents and papers that had contact information for family members. The second boat then departed.

11. A few hours later, the migrants arrived at a beach in the vicinity of Progreso, Mexico. When the migrants arrived, they waded in the water until they reached the beach where the kidnappers met them, armed with machetes. The kidnappers placed hoods over the migrants' heads and loaded them into a white-panel, work-style van. The migrants were transported to a large, gated, compound-style residence with a pool. The kidnappers referred to the residence as "La Finca." Based on my training and experience, I know that the Spanish word "La Finca," translates to the English word, "the farm."

12. When the migrants first arrived at "La Finca," CO-CONSPIRATORS 1, 2, and 3 instructed the migrants to take off their clothing, shower, and change clothes. The kidnappers then inquired about the fee that the migrants were supposed to pay to be smuggled out of Cuba. CO-CONSPIRATOR 1 asked VICTIM 1 how much money he had. When VICTIM 1 said he would be paying $3,000 USD (the amount he originally offered to pay to get to the United States, before boarding the vessel),[1] CO-CONSPIRATOR 1 advised him that that amount was not enough. CO-CONSPIRATOR 1 told VICTIM 1 that the fee was $6,000 USD to be transported to Mexico and $10,000 USD for the United States.

13. Subsequently, CO-CONSPIRATOR 4 and GONZALEZ VIDAL arrived at "La Finca." According to VICTIM 1, GONZALEZ VIDAL and CO-CONSPIRATOR 4 appeared to be in charge of the other kidnappers because they were not living at the residence with the migrants, but came to the farm to give the kidnappers instructions and ensure that the migrants were paying the ransom fees.

14. After being locked in "La Finca" for approximately one week, the kidnappers told the migrants who had not yet paid the ransom fee that they were going to be transported in small groups to another location that the kidnappers referred to as "El Calabozo." Based on my training and experience, the Spanish word "El Calabozo," translates to the English word, "The Dungeon." When the migrants arrived at "El Calabozo," GONZALEZ-VIDAL and the other kidnappers locked VICTIM 1 and the other migrants in a room without beds. The kidnappers then had each migrant call their families to collect the ransom money. The kidnappers

---

[1] VICTIM 1 did not bring this amount with him on the trip. He had hoped that his family would help him pay the fee.

commanded the migrants to tell their families that if the ransom was not paid, they were going to kill them.

15. When it was VICTIM 1's turn to make a call, he called his brother, WITNESS 1. The kidnappers advised WITNESS 1 that they were holding VICTIM 1 captive and that they would only release him if they received $10,000 USD. WITNESS 1 advised the kidnappers that he did not have that kind of money. The kidnappers hung up the phone and ordered VICTIM 1 to go to another room.

16. When VICTIM 1 arrived in the next room he saw several weapons, including knives, wooden paddles, and devices used for electrocution. The kidnappers advised VICTIM 1 that the weapons were used to torture migrants who had not paid their ransom and told him to take off his clothes. Next, they beat VICTIM 1 with a large wooden paddle about ten times while they held a knife to the back of his neck. GONZALEZ VIDAL told the kidnappers that VICTIM 1 had not been beaten enough and instructed them to continue. The kidnappers then took a picture of VICTIM 1's bruised body and, using the Mexican telephone number ending in -3555, sent it to WITNESS 1. CO-CONSPIRATORS 1 and 2 told VICTIM 1 that each day would get worse until the ransom fee was paid.

17. The kidnappers called WITNESS 1 back and demanded the ransom fee. After seeing the picture of VICTIM 1's bruised body, WITNESS 1 begged for additional time to collect the money. WITNESS 1 enlisted the help of other family members, such as WITNESS 2, to help raise money to pay the ransom fee.

18. The kidnappers continued to contact WITNESS 1 and threatened to torture and kill VICTIM 1 if they did not receive the money. Specifically, on or about May 17, 2018, the kidnappers sent WITNESS 1 a text message, instructing him to send money via Western Union

to CO-CONSPIRATOR 4, using his true name. About a week later, on or about May 24, 2018, the kidnappers sent WITNESS 1 another WhatsApp message instructing him to send payments to two other co-conspirators. The kidnappers also advised WITNESS 1 that they would arrange for him to meet with one of their Miami-based associates in person if he preferred to pay the ransom in cash, but he declined. At one point, WITNESS 2, who lived in Cuba, paid $2,000 in cash to a co-conspirator that was based in Cuba.

19. Meanwhile, during the time that VICTIM 1 waited for his family to collect the money, he observed CO-CONSPIRATORS 1, 2, and 3 give drugs and alcohol to one of the female Cuban migrants and then rape and beat her. The kidnappers also showed the migrants pictures of themselves torturing other migrants whom had previously been kidnapped and whom could not pay the ransom fee. VICTIM 1 recalled that in one of the pictures, the kidnappers had crucified one of the victims.

20. At some point, VICTIM 1 observed CO-CONSPIRATOR 3 hit one of the migrants in the back of the head with a wooden board. The migrant lost consciousness and was bleeding from his head. CO-CONSPIRATOR 3 mistakenly believed that the migrant did not have money to pay the fee. GONZALEZ VIDAL slapped CO-CONSPIRATOR 3. The kidnappers then instructed VICTIM 1 to clean the blood off the floor and take the migrant to the shower and clean him up. GONZALEZ VIDAL told the other kidnappers that if the migrant died, they were to cut up his body and throw him in the ocean.

21. While in captivity, VICTIM 1 also observed GONZALEZ VIDAL inform the other kidnappers to tell the migrants' family members that if they were located in the Miami area, his mother would be able to collect the ransom money from them in cash.

22. VICTIM 1 was held in captivity for approximately two months and, during that time, was mostly fed only bread and water. He was beaten and/or electrocuted almost every day. The kidnappers eventually released VICTIM 1 and left him on the streets of Mexico without any identification or money.

23. During his interview, that occurred on November 3, 2020, VICTIM 1 reviewed a photo line-up, which depicted six individuals. VICTIM 1 identified GONZALES VIDAL as "El Chupa," one of the men who kidnapped and tortured him and the other Cuban migrants. VICTIM 1 stated that GONZALEZ VIDAL appeared to be in charge because he instructed the other kidnappers on what to do.

## FOLLOW-UP INVESTIGATION

24. As part of the investigation, the FBI and HSI Miami reviewed WITNESS 1's telephone records and confirmed that, during the time of VICTIM 1's captivity, WITNESS 1 received several phone calls from several Mexican-based telephone numbers, including the Mexican-based telephone number ending -3555. WITNESS 1 also provided federal agents with the text messages and picture that he received from the kidnappers.

25. In addition, the FBI and HSI served a subpoena on Western Union and the subpoena return confirmed that WITNESS 1 and his wife made at least three payments to several co-conspirators, including CO-CONSPIRATOR 4. Each payment was approximately $1,000 USD and was made between May 17 and May 24 of 2018.

26. The FBI and HSI also received information from the Yucatan State Police in Mexico. Mexican law enforcement explained that while conducting an investigation into a separate human smuggling event, the police interviewed CO-CONSPIRATOR 5 in and around October of 2019 in accordance with Mexican laws. During the interview, CO-

CONSPIRATOR 5 admitted that he sold spare parts and engines to a known member of the TCO, CO-CONSPIRATOR 6.[2] CO-CONSPIRATOR 5 further admitted that he had known CO-CONSPIRATOR 6 for years and was aware that he smuggled Cuban migrants from Cuba to the United States, by way of Mexico. CO-CONSPIRATOR 5 insisted that he was not involved in the smuggling operation, but stated that he heard that CO-CONSPIRATOR 6 charged the migrants a $10,000 fee.

27. In accordance with Mexican law, the Yucatan State police reviewed the contents of CO-CONSPIRATOR 5's cellular telephone and, later, provided the FBI with a copy of the phone's contact list. The FBI reviewed the contact list and found several telephone numbers that there is probable cause to believe are associated with GONZALEZ VIDAL, his mother, and his wife. Specifically, CO-CONSPIRATOR 5 had the Mexican telephone number ending in -3555 listed as "JM." JM are the initials of GONZALEZ VIDAL'S first and middle names (which are Jose Miguel). Additionally, CO-CONSPIRATOR 5 listed another Mexican telephone number ending in -8655 as "JM2 Esposa." Based on my training and experience, I know that the word "esposa" means "wife" when translated from Spanish into English. Thus, "JM2 Esposa" means "JM2 Wife." CO-CONSPIRATOR 5 also had the Miami-based telephone number ending in -0862 listed as "Mama; Jose Miguel."

28. Next, the FBI used a database to research all money transfer transactions involving GONZALEZ VIDAL. The FBI found that the Mexican-based telephone number ending in -8655 was listed in the Western Union records as belonging to GONZALEZ VIDAL'S

---

[2] CO-CONSPIRATOR 6 is currently serving time in federal prison for smuggling Cuban migrants into the United States.

9

wife. Based on the fact that CO-CONSPIRATOR 5 listed the Mexican-based telephone number ending in -8655 as "JM2 Esposa," there is probable cause to believe that the Mexican-based telephone number ending in -3555, which CO-CONSPIRATOR 5 listed as "JM," belongs to GONZALEZ VIDAL. This is especially true, in light of the fact that it was the number that the kidnappers used to send a picture of VICTIM 1's bruised body to WITNESS 1 after he told the kidnappers that he could not afford to pay the ransom fee.

29. The FBI also found that the Miami-based telephone number ending in -0862 was listed in the Western Union and Money Gram records as belonging to GONZALEZ VIDAL'S mother and that, during the time that VICTIM 1 was held captive, GONZALEZ VIDAL'S mother sent two money transfers (one transfer using Western Union, and another using Money Gram) to GONZALEZ VIDAL, using their true names. Specifically, both transactions occurred on May 14, 2018, about an hour apart. The total amount of the transactions was $1918.48. These transactions corroborate the conversation that VICTIM 1 heard in which GONZALEZ VIDAL stated that his mother was available to pick up ransom payments from family members who lived in Miami.

## CONCLUSION

30. Based upon the aforementioned information, there is probable cause to believe that GONZALEZ VIDAL did knowingly:

   a. Conspire to encourage and induce an alien to enter the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

b. Encourage and induce and alien to enter the United States, in violation of Title 18, United States Code, Section 1324(a)(1)(A)(iv);

c. Conspire to bring an alien into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

d. Bring an alien into the United State for financial gain, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii);

e. Conspire to commit kidnapping Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c); and

f. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(a)(1).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

ID #7321

Albert M. Ordoñez
Special Agent
Homeland Security Investigations

Attested to by the Applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone this 24th day of November 2020, in Miami, Florida.

THE HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE

11